UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| COMMONWEALTH OF MASSACHUSETTS,<br><br>                                Plaintiff,<br><br>v.<br><br>ATLANTIC OLIVER II FRANCIS AVENUE, LLC,<br><br>                                Defendants. | Case No. 1:24-cv-12035<br><br>**COMPLAINT** |

**INTRODUCTION**

1. Atlantic Oliver II Francis Avenue, LLC ("Atlantic Oliver" or "Defendant") owns an approximately 60-acre property located at 241 Francis Avenue in Mansfield, Massachusetts (the "Facility"), which they lease to several companies operating land transportation and warehousing activities. Defendant discharges polluted stormwater into an exposed water channel that flows to wetlands adjacent to the Canoe River. These wetlands and the exposed water channel are collectively referred to herein as the "Canoe River Wetlands." The Canoe River is connected to the Taunton River, which drains to Mount Hope Bay.

2. Atlantic Oliver never applied for nor received a federal industrial stormwater discharge permit ("Stormwater Permit") for these discharges, as required by the federal Clean Water Act. 33 U.S.C. §§ 1251-1387 (the "Clean Water Act" or "the Act"), and it is not properly monitoring and controlling these discharges as required by the Act.

3. Stormwater discharged from land transportation and warehousing facilities commonly contains pollutants that pose a threat to water quality, wetlands, and aquatic ecosystems.

1

4. Rain and snow melt (jointly "stormwater") flow over the ground surface, motor vehicles, and other industrial materials and equipment present at the Facility. Stormwater picks up pollutants at the Facility and carries those pollutants to the Canoe River Wetlands, some of which are within the Corporal Robert Francis Hardy Conservation Area ("Hardy Conservation Area").

5. Defendant's discharges of stormwater to the Canoe River Wetlands are in violation of the Clean Water Act. The Commonwealth of Massachusetts brings this civil suit to enforce the requirements of the Act. The Commonwealth seeks injunctive relief, civil penalties, and other relief the Court deems appropriate to redress the Companies' illegal discharges of pollution.

## JURISDICTION AND VENUE

6. This Court has jurisdiction over the parties and the subject matter of this action pursuant to Section 505(a)(1)(A) of the Act, 33 U.S.C. § 1365(a)(1)(A), and 28 U.S.C. § 1331 (an action arising under the laws of the United States).

7. On August 8, 2023, the Commonwealth provided notice of Atlantic Oliver's violations of the Clean Water Act, and of its intention to file suit against Atlantic Oliver (the "Notice Letter"), to the Administrator of the United States Environmental Protection Agency ("EPA"); the Administrator of EPA Region 1; the Commissioner of the Massachusetts Department of Environmental Protection ("MassDEP"); and to Atlantic Oliver, as required by the Act, 33 U.S.C. § 1365(b)(1)(A).

8. More than sixty days have passed since notice was served.

9. This action is not barred by any prior state or federal enforcement action addressing the violations alleged in this Complaint.

10. The Commonwealth has an interest in protecting for itself and its residents the integrity of the Massachusetts environment including its waters, and the related health, safety,

economic, recreational, aesthetic, and environmental interests those waters provide. Polluted stormwater is the leading cause of water quality impairment in Massachusetts.

11. The Commonwealth has an interest in obtaining timely and accurate information concerning pollutant discharges into the Commonwealth's waters, as is required by the Act.

12. The interests of the Commonwealth have been, are being, and will continue to be adversely affected by Atlantic Oliver's failure to comply with the Clean Water Act as alleged in this Complaint. Atlantic Oliver's violations threaten water quality in the Commonwealth and deprive the Commonwealth of essential information concerning water quality. The requested relief will redress the harms to the Commonwealth caused by Atlantic Oliver's activities. Atlantic Oliver's continuing acts and omissions, as alleged in this Complaint, will irreparably harm the Commonwealth, for which harm it has no plain, speedy, or adequate remedy at law.

13. Venue is proper in the District Court of Massachusetts pursuant to Section 505(c)(1) of the Act, 33 U.S.C. § 1365(c)(1), because the source of the violations is located within this judicial district.

**PARTIES**

14. Plaintiff is the Commonwealth, appearing by and through the Attorney General.

15. The Attorney General is the chief law officer of the Commonwealth, with offices at One Ashburton Place, Boston, Massachusetts. She is authorized to bring this action and to seek the requested relief under G.L. c. 12, §§ 3 and 11D.

16. Defendant Atlantic Oliver II Francis Avenue, LLC is a limited liability company with its principal address listed as 125 High Street, Suite 220, Boston, Massachusetts. Atlantic Oliver owns the property where the Facility is located.

## STATUTORY BACKGROUND

### Federal Clean Water Act Requirements

17. The Clean Water Act makes the discharge of pollution into waters of the United States unlawful unless the discharge follows certain statutory requirements, including the requirement that the discharge be permitted by EPA under the National Pollutant Discharge Elimination System ("NPDES"). *See* Sections 301(a), 402(a) and 402(p) of the Act, 33 U.S.C. §§ 1311(a), 1342(a), 1342(p).

18. During every rain or snowmelt event, runoff flows over the land surface, picking up potential pollutants such as sediment, organic matter, nutrients, metals, and petroleum by-products. Polluted stormwater runoff can be harmful to plants, animals, and people.

19. To minimize polluted stormwater discharges from industrial facilities, EPA has issued the general industrial Stormwater Permit under the NPDES program. EPA first issued the Stormwater Permit in 1995 and reissued the permit in 2000, 2008, 2015, and 2021. *See* 60 Fed. Reg. 50804 (Sept. 29, 1995); 65 Fed. Reg. 64746 (Oct. 30, 2000); 73 Fed. Reg. 56572 (Sept. 29, 2008); 80 Fed. Reg. 34403 (June 16, 2015); 86 Fed. Reg. 10269 (Feb. 19, 2021). Citations herein are to the 2021 Stormwater Permit, which is the same for all relevant purposes as the 2015 version, except that the 2021 revision now requires indicator monitoring for land transportation and warehousing facilities (facilities in Sector P).

20. Owners and operators of land transportation and warehousing facilities that discharge industrial stormwater to waters of the United States are subject to the requirements of this Stormwater Permit. Stormwater Permit, Appendix D, pg. D-4.

21. The Stormwater Permit requires the Companies to, among other things:

   a) prepare a stormwater pollution prevention plan ("SWPPP"), Stormwater Permit, Sections 6 (pgs. 55-64); 8.P.4 (pgs. 170-71) (land transportation and warehousing);

   b) submit to EPA a Notice of Intent ("NOI") to be covered by the Stormwater Permit, Stormwater Permit, Section 1.3 (pgs. 12-13) and Appendix G;

   c) select, design, install, and implement pollutant control measures that minimize pollutants in stormwater discharges, Stormwater Permit, Sections 2 (pgs. 17-26); 8.P.3 (pgs. 169-70) (land transportation and warehousing);

   d) collect and analyze stormwater samples and document monitoring procedures for monitoring requirements that apply to the Facility, Stormwater Permit, Section 4 (pgs. 31-45), including, among other things, quarterly indicator monitoring for: chemical oxygen demand ("COD"), total suspended solids ("TSS"), and pH, Stormwater Permit, Sections 4 and 8.P.6 (pg. 171) (land transportation and warehousing);

   e) conduct and document routine Facility inspections and quarterly visual assessments to, among other things, sample and assess the quality of the Facility's stormwater discharges, ensure that stormwater control measures required by the permit are functioning and are adequate to minimize pollutant discharge, Stormwater Permit, Sections 3 (pgs. 26-30); 8.P.5 (pg. 171) (land transportation and warehousing);

   f) conduct and document corrective actions and additional implementation measures within mandatory timelines to expeditiously eliminate excessive stormwater pollution whenever required by the permit, Stormwater Permit, Section 5 (pgs. 44-55); and

g) timely prepare and submit to EPA all required documents and reports, including but not limited to discharge monitoring reports and annual reports that include findings from the Facility inspections and visual assessments and the documentation of corrective actions, Stormwater Permit, Section 7 (pgs. 64-70).

### Citizen Suit Provision of the Clean Water Act

22. Section 505(a)(1) of the Act authorizes citizen enforcement actions by any "person" against any "person," including individuals, corporations, or partnerships, for violations of NPDES permit requirements and for unpermitted discharges of pollutants. 33 U.S.C. §§ 1365(a)(1) and (f), 1362(5).

23. The Commonwealth is a "person" having an interest which is or may be adversely affected by unauthorized stormwater discharges. *See* 33 U.S.C. § 1365(g).

24. Under Section 505 of the Act, this Court has authority to enjoin Defendants' violations of the Act's prohibition on unauthorized discharges of pollutants and to require the Companies to comply with the Stormwater Permit. The Court also has authority to impose penalties of up to $66,712 per day for each of the company's prior violations. *See* 33 U.S.C. §§ 1365(a), 1319(d); 40 C.F.R. § 19.4; 88 Fed. Reg. 89312 (Dec. 27, 2023).

### STATEMENT OF FACTS

### Description of the Facility and Activities

25. The Facility consists of more than 60 acres on which Atlantic Oliver's tenants conduct their businesses and store industrial equipment and materials.

26. Companies operating at the Facility conduct warehousing, storage, and transportation activities at the Facility. As part of their activities companies store vehicles,

heavy equipment, truck trailers, truck tractors, truck beds, shipping containers, and dumpsters at the Facility.

27.     The vehicles, heavy equipment, truck trailers, truck tractors, truck beds, shipping containers, dumpsters, and other industrial materials stored by companies operating at the Facility are collectively referred to herein as "Industrial Equipment and Materials."

28.     A portion of the Canoe River Wetlands that the facility discharges into is within the Hardy Conservation Area. The Hardy Conservation Area is an important resource for local communities and plays a critical part in the Canoe River Greenbelt that runs through the towns of Sharon, Foxborough, Mansfield, Easton, and Norton.

29.     The following aerial image obtained from MassDEP's Wetland and Wetland Change Areas Map has been annotated by the Attorney General's Office to show the location of the Facility in relation to the exposed water channel, the Hardy Conservation Area.



**Facility's Discharges of Pollutants from the Facility**

*Polluted Industrial Stormwater Discharges to the Canoe River Wetlands*

30.     During every rain or snowmelt event, runoff flows over the ground surface and over Industrial Equipment and Materials at the Facility.

31.     For at least five years, during the rain events listed on Attachment A, Atlantic Oliver has discharged polluted stormwater from the Facility into the Canoe River Wetlands. The following figure taken from MassDEP's Wetland and Wetland Change Areas Map has been annotated by the Attorney General's Office to depict the direction of some of the stormwater flows from the Facility into the Canoe River Wetlands.



32.     A portion of the Canoe River Wetlands within 350 feet southeast of the Facility has been designated by the Commonwealth to be "Core Habitat" critical to the long-term persistence of Philadelphia Panic-grass (*Panicum philadelphicum* ssp. *philadelphicum*), a state-listed Special

Concern plant species. These areas have also been designated as "Core Habitat for a Priority & Exemplary Natural Community" for the Alluvial Atlantic White Cedar Swamp and "Priority and Estimated Habitat" for the Marbled Salamander (*Amybstoma opacum*), a state-listed threatened salamander species. The Marbled Salamander breeds in vernal pools and other suitable wetlands with appropriate hydrology. Moreover, the areas adjacent to the south and east boundaries of the Facility are designated as "Estimated Habitats of Rare Wildlife" by the National Heritage & Endangered Species Program.

*Potential Impacts from Pollutants in Companies' Stormwater Discharges*

33. Stormwater discharged from land transportation and warehousing facilities is likely to contain numerous pollutants. The Stormwater Permit requires these facilities to conduct quarterly indicator monitoring for COD, TSS, and pH to provide a baseline and comparable understanding of industrial stormwater discharge quality, broader water quality problems, and stormwater control measure effectiveness at these facilities.

34. COD is a measurement of organic matter in water. Excessive discharges of organic matter pose a risk of harm to water quality and aquatic life. When high levels of organic matter are discharged to a waterbody, the presence of bacteria, fungi, and other decomposer organisms increases. The presence of decomposer organisms and the decomposition process lowers the available oxygen in the water, impairing and potentially asphyxiating aquatic organisms.

35. TSS is an indicator parameter that measures the presence of solids, or sediment, suspended in a water sample. Even uncontaminated sediment destroys habitat, harms aquatic organisms, and can contribute to flooding. Sediment settles to the bottom of a river where it disrupts and smothers bottom-feeding organisms. Sediment becomes suspended in water, where

it harms and kills fish by clogging their gills, making it harder for them to breathe. Excessive sedimentation harms the entire food chain by destroying habitat and killing the smaller organisms on which larger ones depend. For example, sediment in the water column increases turbidity, reducing light penetration, decreasing the ability of plant communities to photosynthesize, preventing animals from seeing food, and reducing fish populations. Sediment poses particular risks to wetlands, which play an integral role in the ecology and hydrology of the watershed. The combination of shallow water, high levels of nutrients, and high primary productivity is ideal for the growth of organisms that form the base of the food web and feed many species of fish, amphibians, shellfish, and insects. TSS can harm wetlands by, among other ways, suffocating the native species and allowing noxious and invasive species to come in and dominate the area. Sedimentation can also decrease wetland volume, decrease the duration that wetlands retain water, and change plant community structure. This can severely harm vegetation, soils, and downstream water quality and significantly increase the risk of flooding.

36.     The term pH refers to the basicity or acidity of a solution on a scale of 0 to 14, with pH 7 being neutral. Most living organisms, especially aquatic life, function at the optimal pH range of 6.5 to 8.5. Industrial effluents can change the pH values of nearby waterways. Fluctuating pH or sustained pH outside the optimal range physiologically stresses many species and can result in decreased reproduction, decreased growth, disease, or death. This can ultimately lead to reduced biological diversity in streams or wetlands. Even small changes in pH can shift community composition in water bodies. This is because pH alters the chemical state of many pollutants (e.g., copper, ammonia), changing their solubility, transport, and bioavailability. This can increase exposure to and toxicity of metals and nutrients to aquatic plants and animals.

pH is one of the most important environmental factors limiting species distributions in aquatic habitats.

37. The tributary creeks and wetlands within the Taunton River watershed, including the Canoe River Wetlands, are important in protecting aquatic resources by acting as a natural filtering system for water quality, preventing downstream flooding, and providing natural habitats to native species.

38. The Canoe River watershed and aquifer system is also a vital component of the drinking water supplies for the town of Mansfield. The Canoe River Aquifer is the only viable source of drinking water for 50,000 people.

## Atlantic Oliver's Failure to Comply With the Requirements of the Stormwater Permit

39. Atlantic Oliver has not applied for or obtained a Stormwater Permit for operations at the Facility.

40. Atlantic Oliver has not complied with the terms of the Stormwater Permit. In particular, it failed to:

   a. prepare a SWPPP for the Facility (violation of Sections 6 and 8.P.4 of the Stormwater Permit);

   b. submit an NOI for the Facility (violation of Section 1.3.2 of the Stormwater Permit);

   c. select, design, install, and implement pollutant control measures that minimize pollutants in stormwater discharges (violation of Sections 2 and 8.P.3 of the Stormwater Permit);

   d. collect and analyze stormwater samples and document monitoring procedures for monitoring requirements that apply to the Facility,

including quarterly indicator monitoring for COD, TSS, and pH (violation of Sections 4 and 8.P.6 of the Stormwater Permit);

    e.    conduct and document routine Facility inspections and quarterly visual assessments to, among other things, sample and assess the quality of the Facility's stormwater discharges, ensure that stormwater control measures required by the permit are functioning correctly and are adequate to minimize pollutant discharges, and ensure timely corrective actions are taken when they are not (violation of Sections 3 and 8.P.5 of the Stormwater Permit);

    f.    conduct and document corrective actions and additional implementation measures within mandatory timelines to expeditiously eliminate excessive stormwater pollution whenever required by the permit (violation of Section 5 of the Stormwater Permit); and

    g.    timely prepare and submit to EPA all documents and reports, including but not limited to discharge monitoring reports and annual reports that include findings from the Facility inspections and visual assessments and the documentation of corrective actions (violation of Section 7 of the Stormwater Permit).

## FIRST CAUSE OF ACTION

**Discharges of Industrial Stormwater Without a Federal Stormwater Permit: Violations of Section 301(a) of the Federal Clean Water Act, 33 U.S.C. § 1311(a)**

41.    The Commonwealth realleges and incorporates by reference the allegations contained in the above paragraphs.

42. Atlantic Oliver is a "person" within the meaning of Section 502(5) of the Clean Water Act, 33 U.S.C. § 1362(5).

43. The Canoe River Wetlands are "navigable waters" within the meaning of Section 502(7) of the Clean Water Act, 33 U.S.C. § 1362(7).

44. By discharging industrial stormwater from the Facility without a Stormwater Permit into the Canoe River Wetlands, Atlantic Oliver violated and continues to violate Section 301(a) of the Act, 33 U.S.C. § 1311(a).

45. Each day during the last five years that Atlantic Oliver discharged industrial stormwater from the Facility into the Canoe River Wetlands without a Stormwater Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a), for each day on which the violation occurred and/or continued. *See also* Sections 505(a)(1) and (f), 33 U.S.C. §§1365(a)(1) and (f).

46. These violations establish an ongoing pattern of failure to comply with the Act's requirements.

## SECOND CAUSE OF ACTION

**Noncompliance with the Federal Stormwater Permit:
Violations of Section 301(a) of the Federal Clean Water Act, 33 U.S.C. § 1311(a)**

47. The Commonwealth realleges and incorporates by reference the allegations contained in the above paragraphs.

48. Atlantic Oliver has violated and continues to violate the Stormwater Permit by failing to implement its requirements, as set forth in paragraph 40, above.

49. Atlantic Oliver's violations of each of the requirements set forth in paragraph 40, above, is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a), for

each day on which the violation occurred and/or continued. *See also* Sections 505(a)(1) and (f), 33 U.S.C. §§ 1365(a)(1) and (f).

50. These violations establish an ongoing pattern of violations with the Stormwater Permit's requirements.

## RELIEF REQUESTED

WHEREFORE, the Commonwealth respectfully requests that this Court grant the following relief:

51. Require Atlantic Oliver to obtain and comply with EPA's federal Stormwater Permit and to cease operations until it has obtained and complied with the Stormwater Permit;

52. Order Atlantic Oliver to pay civil penalties of up to $66,713 per day for each of their prior violations. *See* 33 U.S.C. §§ 1311(a); 1365(a); 1319(d); 40 C.F.R. § 19.4; 88 Fed. Reg. 89312 (Dec. 27, 2023);

53. Order Atlantic Oliver to take appropriate actions to restore the quality of wetlands and waterways subjected to impairment from their unlawful activities;

54. Award the Commonwealth's costs (including reasonable investigative, attorney, witness, and consultant fees) as authorized by the Act, 33 U.S.C. § 1365(d); and

55. Award any other and further relief as this Court may deem appropriate.

Dated: August 8, 2024
Respectfully submitted,

COMMONWEALTH OF MASSACHUSETTS

By its attorney,

ANDREA JOY CAMPBELL
ATTORNEY GENERAL

/s/ E. Field
_____
Emily Mitchell Field (Bar No. 703726)
Assistant Attorney General
Environmental Protection Division
Office of the Attorney General
One Ashburton Place, 18th Floor
Boston, Massachusetts 02108
Tel: (617) 963-2507
Helen.Yurchenco@mass.gov

# EXHIBIT A

### DAYS BETWEEN JULY 13, 2019, AND JULY 13, 2024 ON WHICH STORMWATER FROM FACILITY DISCHARGED INTO WATERS OF THE UNITED STATES

| Year | Month | Date |
|---|---|---|
| 2019 | July | 6, 12, 17, 22, 23 |
|  | August | 7, 28 |
|  | October | 11, 16, 17, 27 |
|  | November | 24 |
|  | December | 2, 9, 14, 30 |
| 2020 | January | 25 |
|  | February | 13, 27 |
|  | March | 19, 23, 29 |
|  | April | 3, 9, 13, 18, 27 |
|  | May | 1, 15 |
|  | June | 6, 11, 28, 29 |
|  | July | 5, 23 |
|  | August | 22, 23 |
|  | September | 10 |
|  | November | 1, 15, 23, 30 |
|  | December | 1, 5, 25 |
| 2021 | January | 16 |
|  | February | 1, 2, 16 |
|  | March | 18, 28 |
|  | April | 1, 16 |
|  | May | 4, 28, 29, 30 |
|  | June | 14, 22, 30 |
|  | July | 1, 2, 3, 9, 12 |
|  | August | 4, 5, 19, 23 |
|  | September | 1, 2, 9 |
|  | October | 4, 25, 26, 27, 30 |
|  | November | 12 |

Exhibit A – Page 1/2

DAYS BETWEEN JULY 13, 2019, AND JULY 13, 2024 ON WHICH STORMWATER FROM
FACILITY DISCHARGED INTO WATERS OF THE UNITED STATES (CONT'D)

| Year | Month | Date |
|---|---|---|
| 2022 | January | 17 |
| | February | 4, 18, 22, 25 |
| | March | 12, 24 |
| | April | 19 |
| | June | 9, 27 |
| | August | 22, 26 |
| | September | 5, 6, 22 |
| | October | 5, 13, 14 |
| | November | 11, 16, 27 |
| | December | 7, 16, 23 |
| 2023 | January | 13, 19, 23, 26 |
| | February | 23 |
| | March | 4, 14 |
| | April | 23, 30 |
| | May | 20 |
| | June | 17 |
| | July | 4, 10, 16, 21, 25, 29 |
| | August | 8, 15, 18, 21, 25 |
| | September | 11, 13, 18, 24, 29 |
| | October | 21 |
| | November | 22 |
| | December | 3, 10, 11, 17, 18, 28 |
| 2024 | January | 7, 9, 10, 13, 26, 28 |
| | March | 2, 7, 10, 23, 28, 29 |
| | April | 3, 4, 12 |
| | May | 8, 16, 23, 26, 30 |
| | June | 14, 21, 26 |
| | July | 13 |

Exhibit A – Page 2/2